## Young v. Commonwealth.

Dec. 16, 1938.

SAM T. JARVIS and CAM HOWARD for appellant.

HUBERT MEREDITH, Attorney General, and WM. F. NEILL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At about 9 or 9:30 o'clock P. M., on February 26, 1938, Albert Simonds was shot to death in front of the Blue Moon cafe in Central City, Muhlenberg County, Kentucky. A subsequently sitting grand jury of the county formally accused by indictment the appellant, Gene Young, as the perpetrator of the homicide, and in which he was charged with murder. At his later trial

he was convicted of voluntary manslaughter and punished by confinement in the penitentiary for the maximum period provided by law of 21 years. From the verdict and judgment pronounced thereon he prosecutes this appeal, and by his counsel urges two grounds as alleged prejudicial errors authorizing the reversal asked for. They are: (1) Error of the court in giving the manslaughter instruction, and (2) error of the court in permitting Otis Robinson, the deputy sheriff who had the jury in charge during the trial, to testify in the case. They will be disposed of in the order named.

1. A brief statement of the facts is necessary in disposing of ground (1). To begin with all of the parties are of African descent. Appellant and William Goatee —as is disclosed by the testimony—were both acquaintances and friends. They were together the greater part of the afternoon of the fatal day, visiting roadhouses, poolrooms, dance halls, and other institutions similarly conducted, at which intoxicants were sold and consumed. The record discloses that both of them liberally engaged in imbibing the latter. They both arrived at the Blue Moon cafe somewhere between 7 and 7:30 o'clock and both continued to patronize the bar. At the immediate time of the homicide dancing was going on in the interior of the building where the business was conducted, and there was also a crowd gathered on the outside close to its front entrance, two of whom were Goatee and the deceased. They engaged in an affray in which Goatee struck deceased with his fist and knocked him against the wall of the building. Loud talking was, no doubt, indulged in, and the incident created more or less excitement and commotion.

According to the testimony of a number of witnesses, who were both on the inside and outside of the building, defendant, upon hearing the disturbance, rushed out of the building—even running over some of the inmates—and approached the deceased who had recovered from the stroke given him by Goatee and said: "Nigger get going." Some of the proof indicates that he grabbed him in the coat collar and gave him a jerk; but, at any rate, they all agree that immediately defendant drew his 45 Colt pistol from its scabbard and fired it at deceased, striking him in the arm. The latter then began to run with defendant pursuing him and firing at him, striking him some three or four times in the back, from the effects of which he immediately died after run-

ning some 100 yards from the front of the cafe to the point where he fell.

That brief recitation of the Commonwealth's testimony is supported by the proprietor of the business, and two or three others who were in the building at the time and by a corresponding or greater number of those who were on the outside, all of whom were eye-witnesses to the transaction. No one said that any other person did the shooting. However, defendant denied doing it and stated that it occurred before he started to go out of the building and that he did start to go out solely for the purpose of ascertaining the cause of the disturbance and for no other purpose. However, the record discloses that when he made his appearance at the door the affray engaged in between Goatee and deceased had not finally ceased and that lingering evidences of it still remained, sufficient to disclose to an observer what was then happening and, possibly, what had previously happened—at least to the extent of disclosing the participants. Possibly as many as two or three other witnesses who were in the building at the time corroborated defendant in the main, but some of those introduced by him testified more vaguely by saying that defendant was inside the building, and if he went on the outside before the shooting they did not see him leave. However, both defendant and all of his witnesses on cross-examination produced the conviction that they were falsifying and that the tales they told were for courthouse service exclusively. Anyone trained or experienced in weighing testimony would have no difficulty in reaching that conclusion. So that, there was abundant testimony to sustain the jury's finding that defendant actually perpetrated the homicide.

In the circumstances so briefly stated it is urged by appellant's counsel in their brief that if their client was guilty at all it was necessarily murder, and that the court erred in giving to the jury the manslaughter instruction whereby it was enabled to return a lesser punishment than that provided for murder. As a consequence it is insisted that the verdict was a compromise one on the part of the jury whereby it returned a manslaughter conviction when its members were unwilling to convict of murder. The cases of Johnston v. Commonwealth, 170 Ky. 766, 186 S. W. 655, and Nicoll v. Commonwealth, 169 Ky. 491, 184 S. W. 386, are cited in support of that argument. We have read them and find

that their facts are altogether different from those appearing in this case, and which will be readily detected by reading them. However, counsel could have cited many other cases sustaining their contention where the facts and circumstances clearly indicated or proved a murderous homicide, without any—even remote—facts that would reduce it to voluntary manslaughter. In such clearly developed cases we have uniformly held that a manslaughter instruction would be inappropriate, and that determination has been made in cases where a convicted appellant insisted upon the giving of a manslaughter instruction, as well as cases (like this one) where he insisted that it was error to do so. But in each and every case where we approved the rule contended for there was an entire absence of any facts tending to reduce the homicide from murder to that of voluntary manslaughter. In this case we have seen that Goatee and appellant were not only acquaintances, but were friends and had been constant associates as visitors upon dives for a greater part of the afternoon of the fatal day. Therefore, when appellant saw his friend engaged in a brawl or fight with one who was a stranger to him, it might well arouse in him sudden heat and passion, and generate a determination to rid his friend of his antagonist by forcing him to "get going" which he proceeded to do when so confronted, according to the overwhelming weight of the testimony.

Testing the soundness of that conclusion, let it be supposed that the court had given in this case only the murder instruction and defendant had received the death penalty, or even the lesser punishment of life confinement in the penitentiary. On appeal prosecuted from such conviction, a large part of brief on his behalf would, no doubt, be devoted to the error of the court in not giving a manslaughter instruction, and we entertain no doubt but that the judgment would be reversed for that error. We, therefore, conclude that ground (1) is without merit.

2. Ground (2) possesses less force than ground (1). Otis Robinson was a deputy sheriff of the county at the time of the homicide, and also at the time of the trial in the following May. The jury that tried the case was put in his charge during the trial. As deputy sheriff he visited the scene following the occasion of the homicide. While there he was shown two empty cartridge shells fitting appellant's pistol. He examined them and re-

turned them to the one from whom he obtained them. He was introduced as a witness to prove only those facts. No objection was made to his testimony at the time; but later an objection was interposed, which was overruled, followed by a motion to discharge the jury and continue the case, which was also overruled. Such action on the part of counsel was based on the fact, as they claim, that Robinson was rendered incompetent to testify because the jury had been put in his charge. No case whatever is cited in support of that contention, and we have made diligent search to find any judicial pronouncement to that effect. If, however, the proposition was a firmly settled one that an officer having charge of the jury during a criminal trial became ipso facto an incompetent witness to testify against the accused on trial, then any complained of testimony given by him would not authorize a reversal of a judgment of conviction, unless the testimony possessed materiality sufficient to create prejudicial error in its admission.

The empty cartridges to which the witness Robinson testified were not found by him on any part of the premises. They were merely inspected by him after having been found by others, and the fact that they were found was thoroughly established. Concretely, Robinson's testimony served only to identify the cartridges shown him as the ones that were introduced on the trial, and which, in view of the other testimony to which we have referred, had but little, if any, bearing upon the case. Moreover, *all* of the testimony relating to the cartridges given by any and all of the witnesses who appeared in the case was of but little if any relevancy, since the only issue in the case was whether or not the appellant did the shooting from the effects of which Simonds was killed, and which, as we have seen, was abundantly proven to be true.

The record discloses that appellant had been the recipient of three felony convictions before the commission of the instant crime, which, had they been charged against him in the instant indictment under our "Habitual Criminal" statute, would have authorized a punishment of life imprisonment instead of the lesser period given him. He, therefore, has cause for self-congratulation.

Perceiving no error prejudicial to appellant's substantial rights, the judgment is affirmed.